**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

**CIVIL ACTION NO. 03-691-C**

**AIRBRUSH EXPRESS, INC., ET AL.,**                                        **PLAINTIFFS,**

**V.**                              **MEMORANDUM OPINION AND ORDER**

**JEFFERSON MALL COMPANY, L.P., and**
**CBL & ASSOCIATES MANAGEMENT, INC.,**                       **DEFENDANTS.**

**\* \* \* \* \* \* \* \* \* \***

This matter is before the court on the motion of the defendants, Jefferson Mall Company, L.P., and CBL & Associates Management, Inc., for summary judgment pursuant to Federal Rule of Civil Procedure 56.  The court, having reviewed the record and being otherwise sufficiently advised, will grant the motion in part and deny it in part.

**I.      FACTUAL BACKGROUND**

The following factual background is stated in a light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

Jason Wilson and Chris Maddox are co-owners of Airbrush Express, Inc. ("Airbrush Express").  In November 2002, Airbrush Express entered into a license agreement with Jefferson Mall by CBL to rent space at the mall for retail sale of custom-airbrushed car tags and t-shirts as approved by the mall management (the "Airbrush" booth).  Subsequently, Airbrush Express entered into a license agreement with Jefferson Mall by CBL to rent space for Photo Images, for retail sale of photo

images on t-shirts, mugs, mouse pads, key chains, buttons, cards, and other related items as approved by mall management (the "Photo" booth).  Maddox and Wilson are listed as contacts in the license agreements and managed both booths.  These agreements are specialty leases.

Wilson and Maddox discussed with the mall combining the two booths into one kiosk.  Wilson approached the assistant mall manager in charge of specialty leasing, Becky Norton, in the second half of July to discuss this topic and she indicated that she liked the concept but that the mall had a problem with the Airbrush booth's clientele.  Norton expressed her desire to speak further with Wilson about this topic in her office at a later date.  (Wilson Depo., 16-17)  Approximately a week later, that discussion occurred.  She told Wilson that the African-American people hanging around the Airbrush booth buying airbrushed shirts were a concern to the mall.  (Wilson Depo., 18-20)  In August, when Maddox went to office to pay that month's rent, Norton told him that the mall did not want to combine the two booths into a kiosk because the Airbrush booth had too many "African" customers congregating around the Airbrush booth and it was not a good image for the mall.  (Maddox Depo., 49)

The Airbrush booth sold shirts with pictures of deceased individuals with the initials "RIP" across the top of the picture.  These shirts were purchased predominantly by African-American people.  (Maddox Depo., 45) Many of the people who purchased the shirts were emotional because they had lost someone close to them.  (Maddox Depo., 45) Groups of up to 25 people would come to the Airbrush booth to purchase

2

the shirts.  (Maddox Depo., 45)  Wilson believed that business would increase when he saw a shooting on television.  (Wilson Depo., 40)  Norton told Maddox that the mall wanted Airbrush Express to stop selling the RIP shirts.  (Maddox Depo., 58)

On September 2, 2003, Angie Carter, the regional manager, spoke with Maddox on the telephone.  She told him that she was in contact with Norton and that the mall had a problem with the people congregating around the Airbrush booth.  The mall management thought the RIP shirts were the problem and wanted the Photo and Airbrush booths to stop selling the shirts or the license agreements would be terminated. (Maddox Depo., 59) After this conversation the booths stopped selling the RIP shirts but they continued to be on display at both booths.  (Maddox Depo., 61) Shirts with the same photo as the RIP shirts with the words "In Loving Memory" were sold at both booths after September 2, 2003.  (Maddox Depo., 65; Wilson Depo., 38) Norton understood from the mall security force that the shirts were sold at the Airbrush booth.  (Maddox Depo., 66)  Airbrush Express received a letter, signed by Norton, terminating the license agreement for the Airbrush booth on September 8, 2003; ordering Airbrush Express to vacate the license area immediately, no later than 9:00 p.m. on September 9, 2003; and warning that failure to comply with the terms of the letter could jeopardize the Photo Images booth operation.  (Termination Ltr.)

After the mall terminated the Airbrush booth's license agreement, on September 9th or 10th, Maddox and Wilson taped a conversation with Norton.  She did not use the term "black" or "African" during this conversation.  (Maddox Depo., 40)  Maddox

3

and Wilson continued their Photo Images business after this conversation.  In November, Maddox and Wilson staged a "sharing" or demonstration at the Photo booth, where they played the recorded conversation with Norton.  They invited customers, store owners, and friends to assemble to discuss the mall's racial discrimination.  Approximately 25 people assembled for the demonstration.  The mall security force asked them to disperse.  (Wilson Depo., 52-53)  When they did not comply, mall security told them to leave.  When they did not, the police were called and everyone at the demonstration left the mall.  (Wilson Depo., 53-54) Maddox and Wilson may have left personal items in the Photo booth – Wilson does not remember whether they were able to get their items at that time.  (Wilson Depo., 59) One to two days later, Wilson and Maddox retrieved all of their personal items and equipment from the Photo booth. (Wilson Depo., 60) Subsequently, the Photo Images license agreement was terminated.

According to Maddox, other stores in the mall attracted an "African" clientele, including Precious Bangles.  No other stores were banished for "catering to an African clientele."  (Maddox Depo., 43-44)

The plaintiffs allege breach of contract, outrage or intentional infliction of emotional distress, race discrimination in violation of 42 U.S.C. § 1981, and denial of a public accommodation in violation of the Civil Rights Act of 1964 and the Kentucky Civil Rights Act.  Maddox and Wilson also allege trespass to chattels and conversion.  This court granted the defendants' motion to dismiss the claims by Maddox and

Wilson for breach of contract, the claims of all of the plaintiffs for outrage/intentional infliction of emotional distress, and the claims of all of the plaintiffs for denial of a public accommodation in violation of the Civil Rights Act of 1964 and the Kentucky Civil Rights Act.[1]   Subsequently, the defendants filed this motion for summary judgment.

## II.   LEGAL STANDARD

"Summary judgment is proper where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law." *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir. 2002) (citing Fed.R.Civ.P. 56(c)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp.*, 477 U.S. at 323. In deciding the motion, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Id.*  A judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A genuine issue exists only when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Browning*, 283 F.3d at 769 (quoting *Anderson*, 477 U.S. at 252).  The initial burden of showing the absence of a genuine issue of material fact rests on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[1] The defendants have also filed several counterclaims which are the subject of a separate motion to dismiss.  As this motion is not ripe at this point, the court will not consider it.

Once the moving party has met its burden, the opposing party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party need not support its motion with evidence disproving the non-moving party's claim.  Instead, the movant need only demonstrate an absence of evidence to support the non-movant's case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996) (citing *Celotex Corp.*, 477 U.S. at 325).  The ultimate question is whether the party bearing the burden of proof has presented a jury question as to each element of its case. *Id.*

## III.    ANALYSIS

The defendants argue that they are entitled to summary judgment on all of the plaintiffs' remaining claims, which are: (1) the individual plaintiffs' claims for trespass to chattels and conversion; (2) Airbrush Express's claim for breach of contract; and (3) the claim under 42 U.S.C. § 1981 by all three plaintiffs.  Each claim is discussed in turn below.

### A.    Individual Plaintiffs' Claims for Trespass to Chattels and Conversion

To sustain their claims for trespass to chattels and conversion, Maddox and Wilson must prove that the defendants unlawfully took away or seized their property. "Conversion" is the wrongful exercise of dominion and control over another's property. *State Auto. Mut. Ins. Co. v. Crysler Credit Corp.*, 792 S.W.2d 626 (Ky. Ct. App. 1990).  The plaintiffs have presented no evidence to support these claims.  While they

6

alleged that the carts contained their property, the plaintiffs presented no proof that they were denied the opportunity to retrieve any of their property. (Wilson Depo., 58-60)   In his deposition, Wilson admits that he does not remember whether the defendants denied him access to his personal property. (Wilson Depo., 59)  Finally, they have not presented any proof of damages resulting from the alleged trespass or conversion.  Consequently, summary judgment is appropriate on these claims.

**B.    Airbrush Express's Claim for Breach of Contract**

To sustain its claim for breach of contract, Airbrush Express must show that the parties had a contract which the defendants breached.  Neither party disputes that the parties had license agreements for the Airbrush Express booth and the Photo Images booth and that the agreements were terminated prior to expiration.  Rather, the parties dispute whether terminating the agreements constitutes a breach of the contracts.

Airbrush Express contends that the defendants' termination of the license agreements was motivated by racial discrimination and in retaliation for Maddox and Wilson's opposing the mall's racial discrimination.  To support this claim, Airbrush Express points to racially discriminatory comments allegedly made by Becky Norton, security guards, and other mall store managers[2] and to a tape recording of a conversation between Ms. Norton and Wilson and Maddox.

In response, the defendants contend that they terminated the license

---

[2] At this point, the court declines to detail which of the allegedly discriminatory statements, if any, are admissible because it is unnecessary to do so.

agreements for legitimate reasons: as to Airbrush, because the booth continued to sell the RIP shirts after being told not to do so and because the booth opened late and closed early, the rent payments were late, the booth had sloppy merchandising, and damage was done to the cart; as to Photo Images, because Maddox and Wilson staged a demonstration at the booth.

Even if the defendants had legitimate reasons for terminating the license agreements, a reasonable jury could find that the real reason for termination was not legitimate and permissible under the contract.  Since there is a genuine issue of material fact as to the reason the agreements were terminated, the court cannot determine whether the terminations constituted a breach of the contracts as a matter of law.  Summary judgment is inappropriate on this claim.

**C.   Claims of Airbrush Express and the Individual Plaintiffs for Violation of 42 U.S.C. § 1981**

Airbrush Express and the individual plaintiffs allege that the defendants discriminated against them because of  race, in violation of § 1981.  Specifically, the plaintiffs allege that the defendant deprived them of their right to contract.[3]

Section 1981, which applies to both public- and private-sector actors, guarantees that all persons have the same right to "make and enforce contracts" as

_____

[3] The plaintiffs' complaint alleges only that the defendants denied their right to receive equal benefit of all laws and proceedings for the security of persons and property; however, the plaintiffs' response to the instant motion argues a claim under § 1981's contract protection.  As the defendants do not challenge this change in the plaintiffs' claim, the court will consider the right-to-contract claim instead of the equal-benefit claim.

8

is enjoyed by white citizens and bars intentional discrimination on the basis of race. To prove a prima facie case of discrimination under § 1981, the plaintiffs must show that: (1) they are members of a protected class; (2) the defendants intended to discriminate against them on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute – in this instance, freedom to contract. *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101-02 (10th Cir. 2001). Litigation involving § 1981 most commonly involves the right to make and enforce contracts of employment. *Rivers v. Roadway Express, Inc.*, 511 U.S. 298 (1994). Claims involving commercial establishments have been less frequent but are valid. *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996).

1.     **Member of a Protected Class**

As noted above, § 1981 protects the rights of all "persons" within the jurisdiction of the United States to make and enforce contracts, as that right is "enjoyed by white citizens." Airbrush Express is not a "person" but a corporation, and thus apparently without racial identity. The defendants have not argued that Airbrush Express lacks standing to assert a claim under § 1981, however, and the court concludes that a corporation owned and staffed by two Caucasian men, which sells to a primarily African-American clientele, has standing to assert a claim under § 1981 based on racial discrimination directed at its customers and meets the requirement of "member of a protected class" for purposes of § 1981. Further, the racial identity that the parties have assigned to the corporation is an African-American or black identity.

9

*See John & Vincent Arduini, Inc. v. Nynex*, 129 F. Supp. 2d 162, 169 (N.D.N.Y. 2001) (corporation owned by two Caucasian males has standing to sue under § 1981 when claimed that it lost right to contract because hired Hispanic supervisor).

The individual defendants, Maddox and Wilson, allege that they were retaliated against because they refused to discriminate against Airbrush Express's black clientele. In cases where Caucasians assert a claim for retaliatory discrimination, courts do not require them to show that they are a member of a protected class to meet their prima facie case burden, as such a showing is inapplicable to that fact situation. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 279 (1976).

## 2.    Intent to Discriminate

Intent to discriminate can be shown by direct or circumstantial evidence.  A "direct evidence" discrimination case requires proof which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the defendants' actions.  The plaintiffs do not present direct evidence of discriminatory intent.  Consequently, the plaintiffs' claims must be evaluated under the tripartite framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

If the plaintiffs establish a prima facie case of intentional racial discrimination, the burden shifts to the defendants to offer a legitimate, nondiscriminatory reason for their actions.  *Carter v. St. Louis Univ.*, 167 F.3d 398, 401 (8th Cir. 1999).  If the defendants make such a showing, the burden then shifts to the plaintiffs to present evidence that the proffered reason was a pretext for unlawful discrimination.  *Carter*,

10

167 F.3d at 401.  The plaintiffs may demonstrate that the proffered reason is pretextual by showing that the reason has no basis in fact, was not the actual reason, or was insufficient to explain the defendants' actions.  *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 879 (6th Cir. 2001).  Although the respective evidentiary burdens shift back and forth under the framework, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

In *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001), the Sixth Circuit defined the elements of intentional discrimination in the commercial establishment context: the plaintiffs must prove that (1) they are members of a protected class; (2) they sought to make or enforce a contract for services ordinarily provided by the defendant; and (3) they were denied that right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) they were deprived of services while similarly situated persons outside the protected class were not, and/or (b) they received the services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.  *Id.* at 872.  Factors relevant to the "markedly hostile" component include whether the conduct was "(1) so profoundly contrary to the manifest financial interests of the merchant and/or [its] employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination."  *Id.* at

11

871.

Airbrush Express has presented sufficient evidence to establish a prima facie case of intentional discrimination.  As discussed above, Airbrush Express is a member of a protected class.  Airbrush Express sought to enjoy the rights and privileges of its contract with the mall, the license agreement, by selling airbrushed shirts and other items to its customers.  While Airbrush Express has not shown that a similarly situated corporation was treated better than it was, it has presented evidence that it was treated in a markedly hostile manner that a reasonable person would find objectively discriminatory.  Airbrush Express argues that the mall did not want it selling the RIP shirts simply because they were purchased primarily by African-American customers and that the mall terminated the license agreement because the airbrush business attracted large groups of African-American people to the mall.  Whether the conduct was sufficiently hostile to constitute a prima facie case is a question of fact for the jury.

The mall has presented several legitimate, non-discriminatory reasons for terminating the contract – the crowds around the booth, complaints from other mall tenants, late payment of rent, sloppy merchandising, etc.  Airbrush Express has presented evidence that these proffered reasons are pretext for racial discrimination.  Maddox and Wilson have testified that the assistant mall manager made racially discriminatory comments about the Airbrush booth's customers and told them that something had to change.  While these comments are not necessarily attributable to

the final decisionmaker, Airbrush Express has presented sufficient evidence to present the question to a jury. *See Wells v. New Cherokee Corp.*, 58 F.3d 233 (6th Cir. 1995) (immediate supervisor who made statement about plaintiff's age did not independently have the authority to fire her, but he consulted with the ultimate decisionmaker and contributed to that decision).   Norton spoke with Carter, who the defendants claim was the ultimate decisionmaker, about terminating the license agreement. *See Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 723-24 (6th Cir. 2004) (plaintiff must show that one employee's "discriminatory motives" somehow influenced the decisionmaker).  A reasonable jury could determine that Norton's alleged racial bias affected Carter's decision to terminate the license agreement.  Further, there is a question of fact as to who made the ultimate decision to terminate the license agreement, as Airbrush Express contends it was Norton and the defendants contend it was Carter.[4]

Maddox and Wilson's proof of intentional discrimination similarly presents a genuine issue of material fact, but their claims cannot survive for failure to meet the third prong under § 1981 as explained below.

### 3.    Interference with Right to Make and Enforce Contracts

The defendants do not contest that Airbrush Express was seeking to enforce its contract with them.  Instead, the defendants argue that the claims of Maddox and

---

[4] The defendants argue that since Carter is African-American she could not have discriminated on the basis of race.  The court finds this argument without any merit. *See Williams v. Staples, Inc.*, 372 F.3d 662, 666 n.2 (4th Cir. 2004) (confronted with the same argument, court noted that one African-American can discriminate against another based on race just as one Caucasian discriminate against another based on race).

Wilson under § 1981 fail because they did not have a written contract with the mall and lacked privity of contract with the mall via the Airbrush Express or Photo Images license agreements.  Even if Maddox and Wilson could prove the other elements of a § 1981 claim, their claims fail because they have not established that the defendants denied them the right to make or enforce a contract.  They have not shown that they, individually, were seeking to make or enforce a contract when the mall allegedly retaliated against them.

Since Airbrush Express has presented a genuine issue of material fact regarding its claim under § 1981, summary judgment is inappropriate at this time on its claim.  Summary judgment on the claims of Maddox and Wilson is appropriate, however, as they have failed to create a genuine issue of material fact on their § 1981 claims.  Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment (DE 41) is **GRANTED IN PART AND DENIED IN PART**.  The motion is granted with regard to claims of Maddox and Wilson for trespass to chattels and conversion and under 42 U.S.C. § 1981, and these claims are **DISMISSED WITH PREJUDICE**.  The motion is denied with regard to Airbrush Express's claims for breach of contract and for violation of 42 U.S.C. § 1981.

Signed on  June 30, 2005

*Jennifer B. Coffman*

**Jennifer B. Coffman, Judge**
**United States District Court**

14